UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
AT LAW AND IN ADMIRALTY

UNITED STATES OF AMERICA,

Plaintiff,

v. Case No.

APPROXIMATELY 816,955.838899 TETHER (USDT) CRYPTOCURRENCY FROM CRYPTOCURRENCY ADDRESS ENDING IN SLN6VW,

Defendant.

**VERIFIED COMPLAINT FOR CIVIL FORFEITURE IN REM**

The United States of America, by its attorneys, Brad D. Schimel, United States Attorney for the Eastern District of Wisconsin, and Elizabeth M. Monfils, Assistant United States Attorney for this district, alleges the following in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

**Nature of the Action**

1. This is a civil action to forfeit property to the United States of America, under 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C), including cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1), for violations of 18 U.S.C. §§ 1343 and 1956.

**The Defendant In Rem**

2. The defendant property, approximately 816,955.838899 Tether (USDT) cryptocurrency from cryptocurrency address ending in SLN6VW, was seized on or about September 30, 2025, in Road Town, Tortola, British Virgin Islands.

3. The United States Secret Service seized the defendant property pursuant to seizure warrant 25-MJ-184 issued by United States Magistrate Judge William E. Duffin in the Eastern District of Wisconsin on September 30, 2025.

4. The defendant property is presently in the custody of the United States Secret Service in Washington, D.C.

**Jurisdiction and Venue**

5. This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

6. This Court has *in rem* jurisdiction over the defendant property under 28 U.S.C. § 1355(b).

7. Venue is proper in this district under 28 U.S.C. § 1355(b)(1) because the acts or omissions giving rise to the forfeiture occurred, at least in part, in this district.

**Basis for Forfeiture**

8. The defendant property is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) because it constitutes or was derived from proceeds traceable to an offense constituting "specified unlawful activity" – as defined in 18 U.S.C. § 1956(c)(7), with reference to 18 U.S.C. § 1961(1) – namely, wire fraud, committed in violation of 18 U.S.C. § 1343.

9. The defendant property is also subject to forfeiture under 18 U.S.C. § 981(a)(1)(A) because it was involved in, or is traceable to funds involved in, money laundering transactions in violation of 18 U.S.C. § 1956.

**Definitions**

10. Cryptocurrency Exchange: A business that allows customers to trade cryptocurrencies or digital currencies for other assets, such as conventional fiat money or other

digital currencies. Exchanges may accept credit card payments, wire transfers, or other forms of payments in exchange for digital currencies or cryptocurrencies.

11. Cryptocurrency: A type of virtual currency in a decentralized, peer-to-peer network medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services, or exchanged for fiat currency or other cryptocurrencies. Individuals can obtain cryptocurrency through exchanges and other intermediaries, person-to-person transfers, the sale of goods or services, or mining. There are thousands of cryptocurrencies, including Bitcoin ("BTC"), Circle ("USDC"), and Tether ("USDT").

12. Coinbase: A secure online cryptocurrency exchange where an individual can buy, sell, transfer and store cryptocurrency whose registration shows that Coinbase is located in San Francisco, California.

13. Fiat Currency: Coin and paper money of a country that has legal tender.

14. Blockchain: Most cryptocurrencies have a "blockchain," which is a decentralized, typically public, transaction ledger containing an immutable and historical record of every transaction involving the cryptocurrency. Some cryptocurrencies operate on blockchains that are not transparent or have built-in protocols designed to conceal transactional information in the furtherance of money laundering making it difficult to trace or attribute transactions. Though the public address of those engaging in cryptocurrency transactions are recorded on a blockchain, the identities of the individuals or entities are not recorded on these public ledgers. It is possible using the blockchain to trace funds forwards and backwards from a single address or a single transaction, not unlike the manner in which investigators trace the movement of funds in fiat currencies.

15. Blockchain Analysis: The process of inspecting, identifying, clustering, modeling and visually representing data on a cryptographic distributed ledger, known as a blockchain. Data

in most blockchains is public, meaning anyone can view the contents. The goal of blockchain analysis is discovering useful information about the different actors transacting in cryptocurrency by using open source and/or subscription analytical tools, such as "Chainalysis" and/or "TRM," to determine what transactions were conducted by that individual or entity. Cryptocurrency transactions are sometimes referred to a "pseudonymous," meaning that they are partially anonymous.

16. Transaction Hash: A unique string of characters that is given to every transaction that is verified and added to the blockchain.

17. Wallet: A wallet is a software program that interfaces with the blockchain and generates and stores public and private keys used to send and receive cryptocurrencies. A wallet can have one or more cryptocurrency addresses that are controlled by the same individual or entity.

18. Bitcoin/Cryptocurrency Address: A public address, which is represented as a case-sensitive string of letters and numbers, is akin to a bank account number, and a private key is a cryptographic equivalent of a Personal Identification Number (PIN) or password.

19. Crypto Confidence Scam: A crypto confidence scam is rooted in investment/securities fraud. While it may start with elements of a romance scam, the goal is to obtain as much money from a victim as possible through fake cryptocurrency investment platforms. The suspect offers the victim high returns for their investment and directs the victim to a custom-created website that appears to be legitimate. Once the victim makes the initial "investment," the fake platform shows substantial gains, which leads the victim to invest more funds. When the victim ultimately tries to withdraw funds from the investment platform, they are told they must pay a tax. Even after paying the tax, the suspect usually comes up with another fee

or aspect to get more funds from the victim. The same process continues until the victim realizes that they have been scammed and stops sending additional funds.

20. Stablecoins: Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the United States dollar, or to a different virtual currency. For example, USDC is a stablecoin pegged to the United States dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

21. Tether (USDT): Tether Limited ("Tether") is a company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

22. Bridge: A bridge is a decentralized finance (DeFi) protocol allowing users to swap one coin to another, as well as change the blockchain in which they are operating. An example would be a change from Bitcoin (BTC) to Tether (USDT) via a bridge. Bitcoin operates on the Bitcoin blockchain and USDT operates primarily on the Ethereum and TRON blockchains.

23. Decentralized Finance (DeFi): Decentralized Finance is a synonymous term for digital assets and cryptocurrency. Decentralized Finance does not interact with a bank or central authority that can provide surveillance or governance over transactions.

24. Tron Network: The Tron network is a cryptocurrency network similar to the Ethereum network, that operates based on smart contracts. Digital assets like USDT can operate on the Tron network if they are TRC20 tokens. A TRC20 token is the standard for the implementation of a smart contract on the Tron blockchain. TRC20 tokens are designed to only operate on the Tron blockchain and can only be transferred to another blockchain network via a bridge. Transactions on the Tron network require Tron to be the "gas," the requisite fees, for each transaction.

25. Smart Contract: A smart contract is logic-based code that governs the transactions of digital assets on a blockchain. The code can include various features like the execution of a swap from one token to another, or the hopping from one blockchain to another, e.g. Ethereum to Tron.

26. Transaction Fee ("gas"): A transaction fee is a fee paid by the party sending virtual currency on a blockchain to reward miners and/or validators for verifying and validating transactions. Transaction fees vary by blockchain and can fluctuate based on factors such as blockchain network traffic and transaction sizes. Senders of virtual currency can increase the transaction fees that they pay to have their transactions confirmed faster by miners and/or validators. Transaction fees are generally paid in a blockchain's native token (e.g., Bitcoin on the Bitcoin blockchain). On the Ethereum network, these transaction fees are called "gas fees." Gas fees are transaction costs paid in Ether ("ETH"), or its fraction, gwei. These fees serve as a form of remuneration for validators who maintain and secure the network. Gas fees fluctuate based on supply, demand, and network capacity, and may increase during periods of network congestion.

27. THOR Swap: THOR Swap is a digital asset protocol that enables the swapping of Bitcoin to ERC20 Tokens on the Ethereum blockchain. When THOR Swap is used, an OP Return is produced, providing the receiving address for the swapped assets.

28. OP Return: An OP Return is language encoded onto the blockchain as part of a Bitcoin transaction. It is often synonymous with a memo line on a check.

29. Based on their training and experience, agents know that although cryptocurrencies such as Bitcoin and Tether have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes, such as money laundering, and is often used as payment for illegal goods and services. By maintaining multiple addresses and/or wallets, those who use

cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track transactions.

**Crypto Confidence Investment Scam – Victim J.F. in the Eastern District of Wisconsin**

30. A male individual having the initials J.F., who resides in the Eastern District of Wisconsin, was the victim of a crypto confidence investment scam in which J.F. was deceived by one or more fraudsters into wire transferring approximately $746,700 from J.F.'s bank account to Coinbase, purchasing cryptocurrency, and sending the cryptocurrency to the fraudsters via a fake investment platform, BitTrade at the domain www.btwsxe.top, under the guise of obtaining a high return on his investments.

**Details of the crypto investment fraud scheme perpetrated against J.F.**

31. On December 18, 2024, J.F. received a text message from a phone number unknown to J.F. The individual identified herself as "Luna Anderson" ("Anderson") and she began engaging in text message conversations with J.F.

32. J.F. and Anderson initially communicated through standard text messages, but after a few days their conversations moved to WhatsApp.

33. Anderson told J.F. about her cryptocurrency investments and sent J.F. a screenshot of her cryptocurrency portfolio valued at $27,857,704.57. Anderson convinced J.F. to begin investing in cryptocurrency as well.

34. Anderson directed J.F. to conduct wire transfers from J.F.'s bank accounts into Coinbase, purchase Bitcoin (BTC), and transfer the BTC to the BitTrade platform www.btwsxe.top at cryptocurrency addresses ending in 61ap and NPGQ.

35. Believing BitTrade to be a legitimate investment platform, J.F. followed Anderson's directions. Between December 21, 2024, and January 21, 2025, J.F. deposited a total

of approximately $746,700 to a Coinbase account via wire transfers from J.F.'s US Bank checking account.

36. After transferring the approximately $746,700 into Coinbase, J.F. purchased BTC with those funds as follows:

A. On December 23, 2024, at 20:02 UTC, J.F. purchased 0.05355784 BTC for a total price of approximately $5,097.

B. On January 2, 2025, at 21:35 UTC, J.F. purchased 0.96541109 BTC for a total price of approximately $96,690.

C. On January 8, 2025, at 23:05 UTC, J.F. purchased 2.99487472 BTC for a total price of approximately $289,990.

D. On January 21, 2025, at 16:39 UTC, J.F. purchased 3.26433047 BTC for a total price of approximately $354,990.

37. J.F. sent the BTC from the four purchases referenced in paragraph 36 to cryptocurrency address ending in y62x.

38. At the direction of Anderson, J.F. used a BitTrade domain of www.btwsxe.top – later determined to be a fake investment domain – and transferred the BTC to cryptocurrency addresses ending in 61ap and NPGQ in the following four transactions:

A. On December 23, 2024, at 20:12 UTC, J.F. sent 0.053558 BTC to address ending in 61ap.

B. On January 2, 2025, at 21:57 UTC, J.F. sent 0.996637 BTC to address ending in NPGQ.

C. On January 9, 2025, at 01:50 UTC, J.F. sent 2.994858 BTC to address ending in NPGQ.

D. On January 21, 2025, at 19:26 UTC, J.F. sent 3.264316 BTC to address ending in NPGQ.

39. By February 7, 2025, J.F. saw on the BitTrade platform that his investment had grown from his original deposits totaling approximately $746,700 worth of BTC to 2,983,254.63 Tether (USDT)[1], which was valued at approximately $2.98 million.

40. On February 7, 2025, J.F. attempted to withdraw his funds through the BitTrade domain he had been using (www.btwsxe.top). However, BitTrade "customer service" informed J.F. that he would have to pay short-term capital gains taxes of 803,042.96 USDT before J.F. could withdraw the funds. BitTrade's message to J.F. read, in part, as follows:

> …your account assets are 2,983,254.63 USDT, minus your deposit amount: 730,699.41 USDT, your accumulated personal short-term capital gains are 2,252,555.22 USDT. Under the IRS policy on taxing cryptocurrencies, short-term capital gains will not receive any special tax treatment and will be taxed directly at the prevailing progressive tax rates since you hold them for a period of no more than 12 months…. The total tax you need to pay is: 803,042.96 USDT.

41. On February 7, 2025, BitTrade "customer service" also told J.F. that he could pay the taxes in either United States dollars or cryptocurrency and that when BitTrade received the tax payment, they "would file [J.F.'s] tax with the IRS and send [J.F.] Form 1040."

42. On February 11, 2025, J.F. was informed the BitTrade domain changed from btwsxe.top to btrlapqidr.top – later determined to also be a fake investment domain.

**Cryptocurrency tracing of victim J.F.'s funds to cryptocurrency address ending in SLN6VW from which the defendant approximately 816,955.838899 Tether (USDT) cryptocurrency was seized**

43. Blockchain analysis shows that the BTC that J.F. deposited to cryptocurrency addresses ending in 61ap and NPGQ (referenced in paragraph 38) were moved through numerous addresses, and a portion of the funds from one of the deposits was ultimately traced to

---

[1] USDT is a stablecoin cryptocurrency with a value meant to mirror the value of the United States dollar. As noted in paragraph 50, the BTC was swapped for USDT on January 22, 2025.

cryptocurrency address ending in SLN6VW from which the defendant approximately 816,955.838899 Tether (USDT) cryptocurrency was seized (the "Subject Address").

44. The transactions described in paragraphs 45-56 follow J.F.'s January 21, 2025, deposit of BTC to cryptocurrency address ending in NPGQ (referenced in paragraph 38D). J.F. did not direct, or have control over, any of the transactions made to his funds after making the January 21, 2025, deposit, or after making the other three initial deposits listed in paragraph 38.

**Tracing of J.F.'s January 21, 2025, transfer of 3.264316 BTC to address ending in NPGQ through various addresses until the funds landed in the Subject Address**

45. On January 21, 2025, J.F. sent 3.264316 BTC to BitTrade cryptocurrency address ending in NPGQ ("NPGQ") (referenced in paragraph 38D), the deposit address provided by Anderson. At the time of the transfer, the 3.264316 BTC was valued at approximately $345,863 in United States dollars.

46. On January 21, 2025, approximately 67 minutes after J.F. sent the 3.264316 BTC to NPGQ, NPGQ sent 3.489970 BTC to cryptocurrency address ending in 9pzx ("9pzx").

47. On January 22, 2025, approximately five hours and eight minutes after receiving the 3.489970 BTC, 9pzx sent 3.489949 BTC to cryptocurrency address ending in DrXa ("DrXa").

48. On January 22, 2025, approximately six hours and 24 minutes after receiving the 3.489949 BTC, DrXa sent 5.665678 BTC to cryptocurrency address ending in Dcae ("Dcae").

49. On January 22, 2025, approximately one hour and six minutes after receiving the 5.665678 BTC, Dcae sent 2.8 BTC to cryptocurrency address ending in 1nzF ("1nzF").

50. On January 22, 2025, approximately four minutes after receiving the 2.8 BTC, 1nzF sent 2.8 BTC to cryptocurrency address ending in 8yly ("8yly"). 8yly is a deposit address to THOR Swap, a swapping service to convert Bitcoin (BTC) to ERC20 tokens for use on the Ethereum

blockchain. The 2.8 BTC was swapped to Tether (USDT).[2] The Op Return for this transaction provided the corresponding address for the USDT as cryptocurrency address ending in 1a21 ("1a21").

51. On January 22, 2025, approximately one hour and 26 minutes after the swap to USDT, 1a21 sent 292,069.107526 USDT via the Ethereum network to cryptocurrency address ending in 32e3 ("32e3").

52. On January 22, 2025, approximately four hours and 39 minutes after receiving the 292,069.107526 USDT, 32e3 sent 320,000 USDT to cryptocurrency address ending in b87a ("b87a").

53. On January 22, 2025, approximately 20 minutes after receiving the 320,000 USDT, b87a sent 320,000 USDT, spread across four transactions of 80,000 USDT each, to cryptocurrency address ending in d1c9 ("d1c9").[3] The USDT was swapped on the Ethereum network to USDT on the Tron network and to cryptocurrency address ending in 713M ("713M").

54. On January 22, 2025, approximately three minutes after receiving the 320,000 USDT, 713M sent 319,003.136167 USDT, spread across four transactions, to cryptocurrency address ending in w3A3 ("w3A3").[4]

55. On January 22, 2025, approximately eight minutes after receiving the 319,003.136167 USDT, w3A3 sent 319,003.136167 USDT to cryptocurrency address ending in E1XG ("E1XG").

---

[2] On January 22, 2025, the estimated price of 2.8 BTC was approximately $295,705 in United States currency or approximately 295,705 USDT.

[3] The address d1c9 is a deposit address for the Bitkeep bridge, maintained by the custodial exchange Bitget.

[4] The address 713M is associated to the Bitkeep bridge and is an exit address on the Tron network. Based on the bridge activity, the outflow of assets from the bridge will get sent to a different address. A bridge swaps (bridges) assets from one blockchain to another blockchain.

56. On January 22, 2025, approximately nine minutes after receiving the 319,003.136167 USDT, E1XG sent 300,000 USDT to the Subject Address, cryptocurrency address ending in SLN6VW from which the defendant approximately 816,955.838899 Tether (USDT) cryptocurrency was seized.

57. Blockchain analysis shows that J.F.'s three other initial deposits referenced in paragraphs 38A, 38B and 38C did not all end up in the Subject Address. Those three deposits were similarly commingled with other digital assets in many other cryptocurrency addresses associated with the crypto investment fraud scheme—including with some of the cryptocurrency addresses referenced in paragraphs 46-55—and landed at other exchanges like Binance and MaskEX.

**Continued Investigation and Additional Victims**

58. The BitTrade domain through which J.F. invested at the direction of Anderson was reported as a fraudulent cryptocurrency investment portal in numerous other incidents documented in the Federal Trade Commission's Consumer Sentinel database. As of April 20, 2025, agents identified 34 such complaints having a total loss amount of $818,207. The complainants detailed a similar scheme of being contacted by a wrong number, having an attractive female send pictures of herself, and discussing cryptocurrency. Complainants stated they saw large profits immediately after trading, and when they wanted to withdraw their profits, they were told they had to pay taxes.

59. Furthermore, as of April 20, 2025, the Federal Bureau of Investigation's Internet Crime Complaint Center database (IC3.gov) showed an additional 15 individuals who reported being the victim of an investment scam involving BitTrade, resulting in a total financial loss of $1,731,360. All of those reports followed the same pattern as the crypto investment fraud scheme perpetrated against J.F.

60. An investigator conducted Domain Name Server (DNS) inquiries on the domains "btwsxe.top" and "btrlapqidr.top" that were used in the crypto investment fraud scheme perpetrated against J.F. Those records show the following:

A. The domain btwsxe.top was registered on December 16, 2024, (two days before Anderson first contacted J.F.) by the Chinese domain name registrar company Shanghai Meicheng Technology Information Development Co. Ltd. (SMTIDCL), which had other domains registered to the same IP address.

B. The domain btrlapqidr.top was registered February 11, 2025, (the same day that J.F. was informed of the domain change from btwsxe.top to btrlapqidr.top) by the same registrar company, SMTIDCL.

61. Based on their training and experience, agents know that domains registered at SMTIDCL are often involved in fraud schemes, especially when associated with ".top" domain extensions.

62. Based on their training and experience, agents know that it is highly common for fraudsters to move funds across multiple addresses, commingling them with other funds, swapping to different coins, and swapping to other blockchains. Funds are moved in rapid succession from address to address and swapped using services like THOR Swap in an effort to obfuscate the true origin of the funds.

63. Based on their training and experience, and the investigation to date, agents believe that the Subject Address contained wire fraud proceeds traceable to the crypto investment fraud scheme perpetrated against J.F.

64. Based on their training and experience, and the investigation to date, agents believe that the Subject Address from which the defendant property was seized, and the other cryptocurrency addresses identified herein, were involved in transactions designed, in whole or in part, to conceal or disguise the nature, source, ownership, control and location of the funds stolen

from J.F. as a result of the crypto investment fraud scheme perpetrated against him and, as such, were involved in money laundering.

65. The defendant property, approximately 816,955.838899 Tether (USDT) cryptocurrency from cryptocurrency address ending in SLN6VW, constitutes or is derived from proceeds traceable to wire fraud in violation of 18 U.S.C. § 1343.

66. The defendant property, approximately 816,955.838899 Tether (USDT) cryptocurrency from cryptocurrency address ending in SLN6VW, was involved in money laundering in violation of 18 U.S.C. § 1956.

## Warrant for Arrest In Rem

67. Upon the filing of this complaint, the plaintiff requests that the Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), which the plaintiff will execute upon the defendant property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

## Claim for Relief

68. The plaintiff repeats and incorporates by reference the paragraphs above.

69. By the foregoing and other acts, the defendant property, approximately 816,955.838899 Tether (USDT) cryptocurrency from cryptocurrency address ending in SLN6VW, constitutes or was derived from proceeds traceable to specified unlawful activity, namely, wire fraud, committed in violation of 18 U.S.C. § 1343, and is therefore subject to forfeiture to the United States of America under 18 U.S.C. § 981(a)(1)(C), with cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1).

70. By the foregoing and other acts, the defendant property, approximately 816,955.838899 Tether (USDT) cryptocurrency from cryptocurrency address ending in SLN6VW, was involved in, or is traceable to funds involved in, money laundering transactions in violation

of 18 U.S.C. § 1956, and is therefore subject to forfeiture to the United States of America under 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, the United States of America prays that a warrant of arrest for the defendant property, approximately 816,955.838899 Tether (USDT) cryptocurrency from cryptocurrency address ending in SLN6VW, be issued; that due notice be given to all interested parties to appear and show cause why the forfeiture should not be decreed; that judgment declare the defendant property to be condemned and forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court may deem just and equitable, together with the costs and disbursements of this action.

Dated at Milwaukee, Wisconsin, this 25th day of February, 2026.

Respectfully submitted,

BRAD D. SCHIMEL
United States Attorney

By: *s/Elizabeth M. Monfils*
ELIZABETH M. MONFILS
Assistant United States Attorney
Wisconsin Bar No. 1061622
Office of the United States Attorney
Eastern District of Wisconsin
517 E. Wisconsin Avenue, Room 530
Milwaukee, WI 53202
Telephone: (414) 297-1700
Fax: (414) 297-1738
E-Mail: elizabeth.monfils@usdoj.gov

## Verification

I, Nicholas Schlereth, hereby verify and declare under penalty of perjury that I am a Special Agent with the United States Secret Service (USSS) and a member of USSS's Criminal Investigative Division, Global Investigative Operations Center, that I have read the foregoing Verified Complaint for Civil Forfeiture *in rem* and know the contents thereof, and that the factual matters contained in paragraphs 29 through 66 of the Verified Complaint are true to my own knowledge.

The sources of my knowledge are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent of the USSS.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Date: 02/24/2026

*s/Nicholas Schlereth*
Nicholas Schlereth
Special Agent
United States Secret Service